| | | |
|---|---|---|
| MEGAN N. HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:14-CV-1138 JAR |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Megan Harris' ("Harris") application for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq*.

### I.      Background

On May 6, 2009, Harris filed an application for supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§1381, *et seq*., alleging disability beginning April 27, 2009. (Tr. 226-232) Her claim was denied on July 31, 2009. (Tr. 106-110)  She filed a timely request for hearing on October 5, 2009.  (Tr. 111) Following a hearing on June 15, 2011 (Tr. 71-82), the ALJ issued a written decision on July 6, 2011 upholding the denial of benefits. (Tr. 88-100) Harris requested review of the ALJ's decision by the Appeals Council; the Appeals Council vacated the hearing decision and remanded the case on November 30, 2012. (Tr. 101-104). The Appeals Council ordered the ALJ to evaluate and assign weight to the treating source opinions; obtain additional evidence concerning Harris' impairments; give further consideration to her maximum residual functional capacity ("RFC") and provide rationale with specific

references to evidence to support his findings; further evaluate Harris' subjective complaints; and obtain evidence from a vocational expert. (Tr. 101-104) Harris appeared and testified at a hearing on May 17, 2013 (Tr. 36-70), but was denied again on June 25, 2013. (Tr. 11-35). Harris filed a Request for Review of Hearing Decision/Order with the Appeals Council on July 25, 2013, (Tr. 7-10), which was denied on April 25, 2014. (Tr. 1-6) Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See Sims v. Apfel, 530 U.S. 103, 107 (2000).

Harris filed this appeal on June 24, 2014. (Doc. No. 1) The Commissioner filed an Answer. (Doc. No. 9) Harris filed a Brief in Support of her Complaint. (Doc. No. 11) The Commissioner filed a Brief in Support of the Answer. (Doc. No. 16) Harris filed a Reply Brief. (Doc. No. 17)

## II.      Decision of the ALJ

The ALJ determined Harris had not engaged in substantial gainful activity since April 27, 2009, the alleged onset date of disability. (Tr. 17) The ALJ found Harris had the following severe impairments: Noonan syndrome[1], hypertrophic cardiomyopathy, premature ventricular contraction ("PVC"), seizure disorder, major depressive disorder ("MDD"), generalized anxiety disorder ("GAD"), panic disorder, and post-traumatic stress disorder ("PTSD"), but that no impairment or combination of impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 16)

After considering the entire record, the ALJ determined Harris had the RFC to perform sedentary work, defined as: "can only occasionally lift or carry ten pounds; can only frequently

---

[1] According to the Mayo Clinic, "Noonan syndrome is a genetic disorder that prevents normal development in various parts of the body." Effects include "unusual facial characteristics, short stature, heart defects, other physical problems and possible developmental delays." No specific treatment exists for Noonan syndrome.   http://www.mayoclinic.org/diseases-conditions/noonan-syndrome//definition/CON-20028908 (last visited September 28, 2015).

lift or carry five pounds; can stand or walk for two hours at one time for a total of six hours in an eight-hour workday; can sit for a total of six hours in an eight-hour workday; can never climb ladders, ropes or scaffolds; can occasionally climb ramps or stairs; can only occasionally balance, stoop, kneel, crouch, or crawl; must never work at unprotected heights or around dangerous moving machinery; must avoid concentrated exposure to extreme cold or heat, weather, wetness or humidity dust, fumes or vibration; limited to occasional superficial, non-confrontational and non–negotiation type of interactions with co-workers or supervisors; limited to work that does not involve team effort in decision making, development of goals and priorities; building of consensual or negotiated outcomes; and can never work with the general public." (Tr. 19)

The ALJ determined Harris is unable to perform any past relevant work, but that jobs exist in significant numbers in the national economy that she can perform, including lens inserter, optical, final assembler, and weight tester. (Tr. 27-28) Thus, the ALJ found Harris not disabled within the meaning of the Social Security Act. (Tr. 15)

### III.    Administrative Record

The following is a summary of the relevant evidence before the ALJ.

### A.    Hearing Testimony

The ALJ held a hearing in this matter on May 17, 2013. Harris testified and was represented by counsel. (Tr. 40-60) Vocational expert Susanne Hollander, also testified at the hearing. (Tr. 60-70)

### 1.    Harris' testimony

Harris was 26 years old at the time of the hearing, living in an apartment with her husband and two children. (Tr. 43, 203) She did not graduate from high school, but has a GED.

(Tr. 41) She took some online classes at Columbia College in Rolla, but stopped in 2010 because she failed the classes. (Tr. 42) She does not have a driver's license. (Tr. 43) Her husband is unemployed and stays home with her during the day (Tr. 42-43)

Harris spends most of the day cleaning the house and taking care of her children. (Tr. 44, 47) She does the laundry and dishes, sweeps and mops the floors, although she needs to take a break every fifteen minutes or so, and cooks almost every day. (Tr. 47, 53) She also reads once a day for twenty minutes. (Tr. 46) Harris goes shopping about twice per week, usually accompanied by her husband; but she has gone to the store alone. (Tr. 44, 46) Otherwise, she only leaves the house for doctor's appointments and to take her children to a park once or twice a month; she has visited her son's school once. (Tr. 45, 48)

Harris testified at length regarding her medical conditions. (Tr. 49-60). Her heart conditions, particularly hypertrophic cardiomyopathy, cause her to experience palpitations an average of three times a day. (Tr. 49) These palpitations cause her to cease activity for thirty minutes and experience fatigue for "[a]nother half an hour to an hour" after the palpitations stop. (Tr. 49-50) Chest pains and lightheadedness accompany these palpitations, and precede them by "[a]round 15 minutes[.]" (Tr. 50-51) She also feels dizziness independent of the chest pains or palpitations, requiring her to lie down an additional two times on average. (Tr. 51-52) During these periods, she "lose[s] focus [and] concentration[.]" (Tr. 52)

In addition, Harris has been diagnosed with Noonan Syndrome, which relates to her small size; she stands four feet, six inches tall, and weighed eighty-seven pounds at the time of the hearing. (Tr. 54) It was her testimony that she is not allowed to pick up either of her children, who weigh "around 30 pounds"; she can lift "[m]aybe 10 pounds" at most. (Tr. 53-54)

Harris testified she could not sit for six hours out of an eight hour work day, because she would "get stiff and start hurting." (Tr. 57) She can stand for "maybe 30 to 45 minutes" before she needs to sit down. (Id.) She thinks she can walk for "[a]bout half an hour" before needing to stop and sit down. (Tr. 57-58)

Harris' file also includes diagnoses of several mental conditions: depression, PTSD, panic disorder with agoraphobia, and bipolar disorder. (Tr. 54) Harris doesn't "like leaving the house" or "being around a lot of people." (Id.) She attributes these aversions to traumatic experiences: she was once raped and "[saw] lots of gang violence and everything growing up." (Tr. 55) She experiences flashbacks "maybe a couple times a week" because of her PTSD, during which she cannot focus or concentrate. (Id.) Because of her experiences, she does "not like being around men." (Tr. 56)

For these conditions, Harris has received numerous treatments and medications. (Tr. 56-60) First, for her heart, Harris takes Toprol-XL. (Tr. 57) She also takes medication for anxiety, which she has found helpful. (Tr. 56) Third, she has gone to "Pathways" for mental health counseling for "a few years on and off," taking a break during her second pregnancy, and resuming afterwards. (Id.) Once a week, a caseworker takes Harris to public places, such as stores and parks, to help her cope with being in public. (Tr. 58) While at these places, the caseworker has not had Harris talk to anyone "yet"; they usually stay for "maybe half an hour"; and they work on "breathing techniques and imagery" to treat "the anxiety and panic attacks." (Tr. 59) Harris testified she thought the counseling was helpful. (Tr. 56)

## 2.     Testimony of vocational expert

With respect to Harris' vocational history, vocational expert Susanne Hollander testified that Harris had worked as an appointment clerk, Dictionary of Occupational Titles ("DOT") number 237.367-010, sedentary, with a specific vocational preparation ("SVP") of 3. (Tr. 61-62)

For the first hypothetical, the ALJ asked Hollander to assume someone of Harris' age, education, and work experience; able to lift and/or carry 10 pounds occasionally and five pounds frequently; able to stand or walk two hours at a time for a total of six hours in an eight hour workday; and able to sit for two hours at a time for a total of six hours in an eight hour workday. (Tr. 62) This individual could not climb ladders, ropes or scaffolds; work at unprotected heights or around dangerous, moving machinery; and must avoid concentrated exposure to extreme temperatures, weather, wetness or humidity, dust, fumes, or vibration. (Id.) She could occasionally balance, stoop, kneel, crouch, or crawl. (Id.) Furthermore, she would be limited to occasional superficial, non-confrontational, and non-negotiation types of interactions with co-workers and supervisors, and work not involving coordination in teams. (Tr. 63) Finally, Harris could not work with the general public. (Id.)

Hollander opined such a person could not perform Harris' past job, but could work as a lens inserter, DOT number 793.687-026, SVP of 2, sedentary work; 1,500 such jobs are estimated to exist in Missouri and 47,000 nationally. (Id.) Second, such a person could work as a final assembler, DOT number 713.687-018, SVP of 2, sedentary work; 830 such jobs are estimated to exist in Missouri, and 25,000 nationally (Id.) Third, such a person could work as a weight tester, DOT number 539.485-010, SVP of 2, sedentary work; 1,400 such jobs are estimated to exist in Missouri, and 78,000 nationally.(Id.) The ALJ then asked Hollander to assume the same limitations as in the first, except the individual could stand or walk six hours

total in an eight hour workday and sit for six hours total in an eight hour workday. (Tr. 65) Hollander opined this individual could still perform the jobs of lens inserter, final assembler, and weight tester. (Id.)

For the second hypothetical, the ALJ asked Hollander to assume the same limitations as the first hypothetical, and that this person would need to take three unscheduled breaks per day, each lasting thirty minutes to an hour; and "would also be off task from work-related activities on a regular basis." (Tr. 66) It was Hollander's testimony that those limitations would preclude competitive employment. (Id.)

Harris' attorney asked Hollander to assume an individual limited to lifting and carrying less than five pounds frequently and ten pounds occasionally; standing or walking continuously for less than 15 minutes and standing; walking less than an hour throughout the day; sitting continuously for five hours and sitting eight hours in a day; and limited to push and pull movements. (Tr. 66-67) The attorney derived this hypothetical from a medical evaluation by cardiologist, Eric Chan, M.D. (See Tr. 768-69) Hollander opined that if such an individual needed to sit for eight hours without walking or standing, then she would be precluded from competitive employment. (Tr. 67)

The ALJ posed another hypothetical from cardiologist Eric Chan, M.D.'s evaluation: this individual would have the same limitations as listed in the attorney's hypothetical, except she could stand and/or walk fifteen minutes continuously; stand and walk less than one hour total in an eight hour workday; sit continuously for five hours at a time; and sit eight hours total in an eight hour workday. (Tr. 68) Hollander determined this individual could perform the jobs of lens inserter, final assembler, and weight tester. (Id.)

Harris' attorney posed a final hypothetical based on a medical source statement from psychiatrist, Bhaskar Gowda, M.D. (Tr. 69, 568-70) The attorney asked Hollander to assume someone "markedly limited"[2] in understanding, memory, sustained concentration, persistence, social interaction, and "ability to adapt to the work environment." (Tr. 69) Hollander determined such limitations would preclude competitive employment. (Id.)

## B. Medical Records

The ALJ summarized Harris' medical records at Tr. 16-26. Relevant medical records are discussed as part of the analysis.

## IV. Standards

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); see also Brantley v. Colvin, 2013 WL 4007441, at *2 (E.D. Mo. Aug. 2, 2013). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920(a), 404.1520(a). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the

_____

[2] The attorney used the following definition of markedly limited: more than moderate[ly] but less than extreme[ly limited], resulting in limitations that seriously interfere with the ability to function independently, or otherwise put, the individual is off task 20 percent of the time." (Tr. 69)

claimant is determined to be not disabled." Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)).  First, the claimant must not be engaged in "substantial gainful activity." 20 C.F.R. §§ 416.920(a), 404.1520(a). Second, the claimant must have a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 416.920(c), 404.1520(c).  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the Regulations.  20 C.F.R. §§ 416.920(d), 404.1520(d). If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Before considering step four, the ALJ must determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as "the most a claimant can do despite [his] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work.  20 C.F.R.  §§ 404.1520(a)(4)(iv),  404.1520(f), 416.920(a)(4)(iv), 416.920(f); McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011). If the claimant can still perform past relevant work, he will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. Id.

At step five, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work in the national economy. 20 C.F.R. §§ 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, then he will be found to be disabled. 20 C.F.R. §§ 416.920(a)(4)(v), 404.1520(a)(4)(v). Through step four, the burden remains with the claimant to prove that he is disabled. Brantley, 2013 WL 4007441, at *3 (citation omitted). At step five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Id. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Meyerpeter v. Astrue, 902 F.Supp.2d 1219, 1229 (E.D. Mo. 2012) (citations omitted).

The court's role on judicial review is to determine whether the ALJ's findings are supported by substantial evidence in the record as a whole. Pate–Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

    (1) The findings of credibility made by the ALJ;

    (2) The education, background, work history, and age of the claimant;

    (3) The medical evidence given by the claimant's treating physicians;

    (4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

    (5) The corroboration by third parties of the claimant's physical impairment;

> (6) The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and
>
> (7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

## V.    Discussion

In her appeal of the Commissioner's decision, Harris raises two issues. First, she alleges the ALJ erred in his RFC determination because he failed to explain how the evidence of record supported his conclusions. (Doc. No. 11 at 8-10) Second, Harris alleges the ALJ failed to consider her headaches when formulating her RFC and improperly discounted the opinions of neurologist M. Akhtar Choudhary, M.D., regarding the impact of her headaches on her ability to work. (Id. at 10-13) Harris asserts the Appeals Council specifically instructed the ALJ to evaluate and assign weight to exhibit 7F, which includes Dr. Choudhary's assessment of Harris' headaches. (Id. at 11)

### RFC finding

A claimant's RFC is defined as the most an individual can do despite the combined effects of all of his or her credible limitations. Moore, 572 F.3d at 523. The ALJ must determine a claimant's RFC based on all of the record evidence, including the claimant's testimony regarding symptoms and limitations, the claimant's medical treatment records, and the medical opinion evidence. See Myers v. Colvin, 721 F.3d 521, 527 (8th Cir. 2013) (RFC must be determined based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own description of her limitations, and supported by some medical evidence). Social Security Ruling 96-8p requires the ALJ to include in the decision a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence.

In his determination of Harris' RFC, the ALJ first considered the lack of objective medical evidence to support the severity of Harris' subjective complaints. (Tr. 21-22) Regarding her mental impairments, the ALJ found that despite Harris' diagnoses and reported limitations, Harris had no history of hospitalization for a mental impairment and demonstrated no suicidal or homicidal ideation throughout the alleged period of disability. (Tr. 20) The record reflects Harris received medication management and community support specialist ("CSS") assistance from Pathways, a community mental health center, from November 2009 to February 2011 and again from April 2012 through March 2013. (Tr. 20, 423-567, 987-1059) Harris stopped treatment while she was pregnant but there is no indication in the record that her mental health symptoms worsened without treatment. (Tr. 21) During these treatment periods, Harris' medications were generally stable and her mental status examinations revealed no indications of significant abnormalities in mood, thought content, judgment, cognitive functioning and psychomotor activity. (Id.)

Harris' issues, including hypertrophic cardiomyopathy with mild obstruction, seizure disorder, and short stature, are common manifestations of Noonan syndrome. (Tr. 21, 894-96, 954, 973) The medical recommendation for individuals with Noonan syndrome such as Harris is regular monitoring and evaluation for treatment. (See Tr. 896)

Harris has undergone numerous echocardiograms that reveal severe asymmetric hypertrophy of the septum but otherwise unremarkable functioning. (Tr. 21, 386-87, 959-60) On June 26, 2009, cardiologist Gong-Yuan Xie, M.D., noted Harris' reported dizziness was most likely related to a "volume issue," and "encouraged [Harris] to take in more sodium and drink more water" to help alleviate the dizziness. Dr. Xie's report also states Harris "ha[d] not

experienced exertional dyspnea" and that she experiences dizziness more when the weather is hot, noting that Harris did not drink very much throughout the day. (Tr. 385)

On June 4, 2010, cardiologist Eric Chan, M.D., evaluated Harris for shortness of breath, stating "it is at baseline" and "stable." (Tr. 599-600) Dr. Chan notes Harris "does not walk very far about one block." (Tr. 599) On January 30, 2011, Dr. Chan reported Harris "has been doing fairly well, no [shortness of breath], no chest pain[, n]o further passing out episodes as she has been a little more active." (Tr. 596)

On May 30, 2012, Harris saw neurologist Salim Shackour, M.D., who reported a normal EEG, a 3-year history of spells of generalized twitching or jerking or shaking without loss of consciousness, and a new onset of frequent headaches of a "somewhat migrainous quality," which Harris reported happening sometimes 3 to 4 times a day, and lasting for 30 minutes to an hour. (Tr. 982, 984) Dr. Shackour ordered a brain MRI with contrast-epilepsy protocol and a sleep deprived EEG to look for focal epileptiform abnormality or generalized epileptiform activity. (Tr. 984)

On October 18, 2012, Manjamalal Sivaraman, M.D., saw Harris for reported seizure-like symptoms. (Tr. 969) Dr. Sivaraman reported that Harris' episodes of "chronic intermittent spells of generalized twitching or jerking or shaking without loss of consciousness … have resolved at this time" (Tr. 970), and that recent seizure workup conducted on June 13, 2012, i.e., a brain MRI and EEG, were both unremarkable." (Tr. 574-89, 969-70) Dr. Sivaraman's report also indicates that Harris' medication for these symptoms (Lamictal) have been working such that she had not experienced such an episode since May 2012. (Id.) Electrocardiograms revealed some premature ventricular contraction ("PVC"), but were generally unremarkable. (Tr. 967, 973)

With regard to her cardiac issues, the medical evidence of record indicates that Harris reported only minor symptoms, if any. (Tr. 22) For example, in January 2010, Harris reported unpredictable episodes of shortness of breath, lasting five minutes and then spontaneously resolving themselves. (Tr. 602) In June 2010, Harris reported episodes of shortness of breath but states she could walk a block. (Tr. 599) Harris did not see a cardiologist again until January 2011 due to her pregnancy. She received some regular treatment during her pregnancy and the record reflects Harris functioned well with minimal complaints. (See Tr. 785-848) In January 2012, Harris denied any significant shortness of breath, chest pain or palpitations. (Tr. 851) In November 2012, Harris reported episodes of headaches with dizziness, but thought they may be associated with a change in her medications. (Tr. 965)

The ALJ further considered that while Harris has received regular care from specialists, the record reflects her care has been routine or conservative, consisting essentially of prescription medications. See Smith v. Colvin, 756 F.3d 621, 626 (8th Cir. 2014) (ALJ's finding that claimant was not disabled was supported by substantial evidence in the record where, *inter alia*, claimant's treatment had been essentially routine and/or conservative in nature). Moreover, the record does not reflect escalating treatment modalities. (Tr. 24) Harris' use of prescription medications does not generally support her allegations, in that they have been relatively stable, with only incremental changes, suggesting they have been effective in controlling her symptoms. (Id.) See Dollens v. Colvin, 2015 WL 1456978, at *7 (E.D. Mo. Mar. 30, 2015).

The ALJ next considered all of the evidence relating to Harris' subjective complaints, and set out specific reasons for discounting her credibility. With regard to Harris' work history, the ALJ found Harris worked only sporadically with poor earnings prior to her alleged disability onset date. (Tr. 23) This raised a question as to whether Harris's continuing unemployment was

actually related to her medical impairments. (Tr. 245-253) Indeed, Harris testified she was terminated from her last job because she became pregnant with her first child. (Tr. 41) "A lack of work history may indicate a lack of motivation to work rather than a lack of ability." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) (citing Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993) (claimant's credibility is lessened by a poor work history)).

The ALJ considered Harris' daily activities, finding them inconsistent with her allegations of disability, but consistent with the determined RFC. (Tr. 23) Harris reported she was able to do housework, prepare daily meals, go shopping once or twice a week, handle her finances, read, watch television, scrapbook, play video games, and care for her children, one of whom is disabled. (Tr. 18, 23, 43-44, 47, 283-84, 286-87) Harris testified she had some issues being in public places due to anxiety (Tr. 57-58); however, the ALJ pointed to records showing Harris has managed to go out into the community with her caseworker, interact with store clerks, and used breathing techniques to successfully cope with her anxiety. (Tr. 23, 510, 1026-27)

The ALJ also noted a number of inconsistencies in the information Harris provided regarding the nature of her seizures, which called into question the reliability of that information. (Id.) For example, she reported to her neurologists in October 2012 that her seizures did not involve a loss of consciousness; in November 2012, she reported to her cardiologists that her seizures did involve a loss of consciousness. (See, e.g., Tr. 965-969) An ALJ may discredit a claimant's subjective allegations of disabling symptoms to the extent they are inconsistent with the overall record as a whole. See Choate v. Barnhart, 457 F.3d 865, 871 (8th Cir. 2006); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529; SSR 96–7p.

The Court finds the ALJ's determination that Harris's statements were not entirely credible is supported by good reasons and substantial evidence. The Court thus defers to his

determination. Cobb v. Calvin, 2014 WL 6845850, at *14 (E.D. Mo. Dec. 3, 2014) (internal citations omitted). See also Polaski, 739 F.2d at 1322.

As for the medical opinion evidence, Harris relies on opinions from four of her treating physicians which she contends support a finding that she was not capable of performing even sedentary work based on a combination of her impairments. (Doc. No. 11 at 8-10) Harris alleges the ALJ did not give proper weight to these opinions, opting instead to "pick and choose" only those portions of the opinions that supported his conclusion. (Id. at 8) In particular, she contends the ALJ failed to give sufficient weight to the opinions of Dr. Choudhary regarding her headaches and their impact on her ability to work.

Psychologist Bhaskar Gowda, M.D., opined that Harris was markedly limited in her ability to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 569-570) Neurologist M. Akhtar Choudhary, M.D., opined that Harris needed to lie down or recline at variable times for 10 to 15 minutes at a time when she suffered a headache. (Tr. at 573) Dr. Choudhary also stated that Harris suffered from complex partial seizures with varied frequency and duration, which would cause her to miss work. (Tr. 590)

Cardiologist Eric Chan, M.D., opined that Harris could stand and/or walk less than 15 minutes continuously and less than one hour of an eight-hour day. (Tr. 768-69) Dr. Chan noted symptoms of fatigue on exertion and dyspnea on mild exercise and stated Harris "has severe left ventricular hypertrophy, with a normal ejection fraction. She has limitations for exertion with concern that this may cause dynamic obstruction, but no other limitations." (Tr. 771)

Psychiatrist, Sreekant Kodela, M.D., opined Harris was moderately limited in numerous mental areas of functioning. (Tr. 1121-22)

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted). A treating physician's opinion is generally entitled to substantial weight but does not automatically control. Brown v. Astrue, 611 F.3d 941, 951-52 (8th Cir. 2010) (quoting Heino v. Astrue, 578 F.3d 873, 880 (8th Cir. 2009) (internal quotations and citation omitted). "An ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." Id. See also Papesh v. Colvin, 786 F.3d 1126, 1132 (8th Cir. 2015). In addition, treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005); House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) (A physician's opinion that a claimant is "disabled" or "unable to work" does not carry "any special significance," because it invades the province of the Commissioner to make the ultimate determination of disability). Regardless of the weight the ALJ decides to afford the opinion of a medical source, the ALJ must "always give good reasons" for the weight assigned to the opinion. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir.2000); Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)). Upon review of the record, the Court concludes the ALJ properly evaluated the medical opinions, listing "good reasons" for the weight given to them. Prosch, 201 F.3d at 1013.

**Dr. Gowda**

The ALJ gave Dr. Gowda's opinions little weight, finding his limitations on Harris' functioning unsupported by his treatment records and objective testing. (Tr. 25) For instance, the

record reflects that Harris received medication management and community support specialist ("CSS") assistance from Pathways, a community mental health center, from November 2009 to February 2011 and from April 2012 through March 2013. (Tr. 20, 423-567, 987-1059) During those periods of time, Harris' medications were generally stable and her mental status examinations revealed no indications of significant abnormalities in mood, thought content, judgment, cognitive functioning and psychomotor activity. (Id.) Harris did well during her appointments, needed minimal help in expressing her thoughts and feelings, used coping skills to manage her anxiety, and demonstrated good mood and affect. If a doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight. Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007). Moreover, Dr. Gowda's opinions consisted primarily of a standardized, check-the-box form in which he failed to provide supporting reasoning or clinical findings. (Tr. 25) A treating physician's checkmarks on a form are conclusory opinions which can be discounted if contradicted by other objective medical evidence. Stormo v. Barnhart, 377 F.3d 801, 805–06 (8th Cir. 2004); Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).

**Dr. Chan**

The ALJ only gave Dr. Chan's opinions partial weight because the medical evidence of record did not support his most restrictive limitations, i.e., that Harris could stand and/or walk less than 15 minutes continuously and less than one hour total. (Tr. 768-69) The ALJ did find Dr. Chan's assessment of Harris' ability to stand and sit for four hours at a time was generally supportive of a sedentary level of exertion and "somewhat consistent" with Dr. Choudhary's opinions, discussed below, that Harris can stand for 2 hours or sit for 2 hours at a time. (Tr. 25-26) The ALJ further found Dr. Chan's opinion was not entitled to greater weight because his

treatment of Harris was generally conservative. (Tr. 25-26) Dr. Chan saw Harris on December 20, 2009 for shortness of breath and dizzy spells. Harris noted that after following up with neurology she had not had any further dizzy spells but continued to have shortness of breath unrelated to exercise. (Tr. 605) Dr. Chan continued Harris on Atenolol and discussed with her the importance of adequate hydration. (Tr. 606) Dr. Chan saw Harris on January 17, 2010 for a follow up for shortness of breath. (Tr. 602-04) She reported her dizziness was resolved with medication and her shortness of breath was stable. At that time, Dr. Chan favored continuing Harris on Atenolol with a routine follow up in 6 months. (Tr. 603) On June 4, 2010, Dr. Chan found Harris' shortness of breath stable. He continued her medication and recommended a follow up in one year. (Tr. 599-601) Dr. Chan saw Harris on January 30, 2011 and reported that "in terms of symptoms [Harris] states she has been doing fairly well, no [shortness of breath], no chest pain[, n]o passing out episodes as she has been a little more active." Dr. Chan reviewed and continued her medications. (Tr. 596-98)

**Dr. Kodela**

The ALJ gave Dr. Kodela's opinions moderate weight because they were generally supportive of the RFC and consistent with Dr. Choudhary's opinions. Dr. Kodela's opinions were not entitled to greater weight, because they were not entirely consistent with her pattern of treatment of Harris or Harris' unremarkable mental status examinations. (Tr. 26, 1014, 1021) For example, on March 5, 2013, a mental state examination showed Harris "not overtly preoccupied or distractible, no agitation or aggression, somewhat anxious, speech normal, mood subjectively described as ok, affect appeared to be slightly anxious but with normal range and reactivity and stable though process and content devoid of any paranoia, psychotic process, formal thought disorder …, delusional beliefs, suicidal or homicidal ideation. Her perceptions were within

normal limits so were her orientation, attention, concentration, insight and judgment." (Tr. 997) Similarly, on January 8, 2013, Harris reported to Dr. Kodela that she was doing well with her anxiety and her depression was under control. (Tr. 1006) On February 5, 2013, Dr. Kodela reported Harris was doing "okay," other than feeling physically ill, and denied any problems. (Tr. 1002)

**Dr. Choudhary**

Dr. Choudhary first saw Harris in August 2009 for reported headaches and dizziness, and continued to treat her for these symptoms through April 2011. (Tr. 575-588) On April 18, 2011, Dr. Choudhary completed a Medical Source Statement - Physical, and included a limitation that Harris needed to lie down or recline at variable times for 10 to 15 minutes each time she experienced a severe headache. (Tr. at 573) Her pain and medication can cause dizziness and/or decreased concentration. (Tr. 572-573) Dr. Chaudhary further opined Harris was capable of lifting 25 pounds frequently and 50 pounds occasionally; standing or walking continuously without a break for 2 hours of an 8-hour day and standing or walking throughout with breaks for 6 hours out of an 8-hour day. He opined Harris could sit continuously for 2 hours and for 6 hours with usual breaks. (Tr. 572) He determined she had limited push and/or pull capabilities because "[h]eavy push-pull can aggravate her headaches." (Tr. 573) According to Dr. Choudhary, Harris must "avoid any exposure" to hazards and heights, and "avoid concentrated exposure" to extreme cold, extreme heat, weather, wetness/humidity, dust/fumes, and vibration.

That same day, Dr. Choudhary completed a seizure questionnaire indicating Harris suffered from "complex partial seizures" with varied frequency and duration, which would cause her to miss a "variable" number of workdays per month. (Tr. 590) Dr. Choudhary noted that medication was helping to improve this condition. (Id.)

Also on April 18, 2011, Dr. Choudhary completed a Medical Source Statement-Mental, opining Harris was not significantly limited in her ability to remember locations and work-like procedures; ability to understand and remember very short and simple instructions and moderately limited in her ability to understand and remember detailed instructions. She was not significantly limited in her ability to follow simple instructions and make simple work-related decisions and moderately limited in carrying out detailed instructions; maintaining attention and concentration for extended periods; maintaining regular attendance, working in coordination with or proximity to others without being distracted by them; and completing a normal workday and workweek without interruption. He further opined Harris was not significantly limited in her ability to interact appropriately with general public and moderately limited in her ability to accept instructions and get along with coworkers or peers. Lastly, he opined Harris was moderately limited in her ability to respond appropriately to changes in work setting and set goals or plan independently. (Tr. 629-630)

The ALJ gave Dr. Choudhary's opinions "moderate weight," finding that while his non-exertional limitations were consistent with Harris' history of hypertrophic cardiomyopathy and seizure disorder, his lifting restrictions were not. (Tr. 25) Cardiologist Dr. Chan stated Harris "has severe left ventricular hypertrophy, with a normal ejection fraction. She has limitations for exertion with concern that this may cause dynamic obstruction, but no other limitations." (Tr. 771) The ALJ further found Dr. Choudhary's opinion that Harris would need to lie down or recline to alleviate her symptoms was not supported by his treatment notes, her pattern of treatment, her substantial activities of daily living, or notes of her treatment with her cardiologists and other neurologists. Her care, albeit from specialists, has been routine or conservative, consisting essentially of prescription medications, with no escalating treatment

modalities. In addition, her use of prescription medications has been relatively stable, with only incremental changes, suggesting effectiveness in controlling her symptoms.

In addition, the ALJ found Dr. Choudhary's opinion that Harris would have to miss work due to seizures was not supported by the medical evidence of record. (Tr. 25) Harris did not report seizures of that nature or frequency and her subsequent diagnostic testing does not support that limitation. An MRI of the brain conducted on June 13, 2012 showed no enhancing lesion, mass, significant signal abnormality, or morphologic abnormality. The temporal lobes were symmetric, flow-voids were present in the major intracranial vessels, and the extracranial spaces were unremarkable. (Tr. 977) A sleep-deprived EEG also conducted on June 13, 2012 for seizure evaluation showed no abnormalities. (Tr. 980) An EEG performed on August 6, 2009 noted no epileptic form activity. (Tr. 586)

The ALJ further found Dr. Choudhardy's opinion that Harris had no areas where she was markedly limited in her ability to function independently to be generally supportive of Harris' RFC and consistent with the opinions of Dr. Kodela, discussed above. (Tr. 25)

Upon review of the record, the Court concludes the ALJ properly evaluated the medical opinions of Harris' treating physicians, Dr. Gowda, Dr. Chan, Dr. Choudhary and Dr. Kodela, listing "good reasons" for the weight given those opinions. The ALJ provided a detailed and extensive discussion of how the medical facts and non-medical evidence supported his finding. The Court finds, therefore, that the ALJ's treatment of the medical opinion evidence is supported by substantial evidence on the record as a whole.

In her reply brief, Harris alleges the ALJ omitted any discussion regarding the actual formulation of the RFC. (Doc. No. 17 at 4) In fact, the ALJ provided an extensive and detailed discussion of the evidence of record, including objective test results, examination results, and the

opinions of Harris' doctors. Social Security Ruling ("SSR") 96–8p provides that the ALJ's RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific evidence. The narrative bridge here is more than adequate. Read as a whole, it is clear the ALJ adequately explained the relationship between the RFC and the medical evidence of record and properly formulated the RFC to engage in a range of sedentary work.

**Severe impairments**

An impairment is not severe if it amounts to only a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities. See Bowen v. Yuckert, 482 U.S. 137, 153 (1987); 20 C.F.R. § 404.1521(a). If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two of the disability evaluation. Page, 484 F.3d at 1043. It is the claimant's burden to establish that her impairment or combination of impairments is severe. Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000). Severity is not an onerous requirement for the claimant to meet, see Hudson v. Bowen, 870 F.2d 1392, 1395 (8th Cir. 1989), but it is also not a toothless standard. See e.g., Page, 484 F.3d at 1043-44.

Harris takes issue with the ALJ's RFC determination because it does not discuss or consider her headaches despite the medical record evidence indicating this impairment was severe. Relying on Mouser v. Astrue, 545 F.3d 634, 639 (8th Cir. 2008), the Commissioner responds that because Harris failed to raise her headaches as a basis for her disability, the ALJ is not obliged "to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." (Doc. No. 16 at 4) While the Court may not agree with the Commissioner's position, see Harper v. Colvin, 2015 WL 5567978, at *5 (E.D.

Mo. Sept. 22, 2015) (distinguishing <u>Mouser</u>), in any event, the ALJ did consider evidence of Harris' headaches in the record as a whole.

On August 18, 2009, Harris presented to Dr. Choudhary with complaints of daily headaches that had increased progressively over the past few months. (Tr. 587) She reported these headaches lasting from a couple of hours to sometimes all day. (<u>Id</u>.) Dr. Choudhary noted Harris had no prior significant history of headaches. He continued Harris on her current medication, prescribed Fioricet for her headaches, and scheduled a follow up appointment for four weeks. (Tr. 588) On August 26, 2009, an electroencephalogram ("EEG") was performed to evaluate any seizure activity. (Tr. 586) Dr. Choudhary reported a normal EEG, with no epileptic form activity noted. (<u>Id</u>.) On June 3, 2010, another EEG was performed to evaluate any seizure activity. (Tr. 582) Dr. Choudhary reported abnormality consistent with seizure disorder and recommended clinical correlation. (Tr. 582) On June 14, 2010, a CT of the brain was performed and Dr. Choudhary reported an "unremarkable CT of the brain." (Tr. 579) Over the next few years, Dr. Choudhary continued to see Harris for headaches, dizziness and seizures. (Tr. 575-577, 581-585, 766, 783) His progress notes reflect a conservative plan of treatment, including continuing Harris on her medications, and routine follow up examinations. Dr. Choudhary's last treatment record is dated April 24, 2012. (Tr. 1072)

On May 18, 2012, Harris also sought care from treating physician, Salim Shackour, M.D., in part, for a reported month-long history of severe daily headaches, lasting for several hours each time. Following a physical examination, Dr. Shackour found Harris had no focal neurological deficit and referred her to a neurology clinic. (Tr. 1105-1109) On May 30, 2012, neurologist Manjamalal Sivarman, M.D., opined Harris' "new onset of frequent headaches appears to be somewhat migranious quality." (Tr. at 984) On November 5, 2012, Sivakumar

Ardhanarl, M.D., opined Harris's symptoms of headaches and seizures could possibly be from her cardiac etiology. (Tr. 967)

As discussed in detail above, in formulating Harris' RFC, the ALJ considered Harris' credibility and found her not entirely credible. The ALJ only included Keeling's credible limitations in her RFC. See Tindell v. Barnhart, 444 F.3d 1002, 1007 (8th Cir. 2006) ("The ALJ included all of [claimant's] credible limitations in his RFC assessment, and the ALJ's conclusions are supported by substantial evidence in the record."). The ALJ also considered Harris' medical records and the opinions of medical professionals and incorporated in the RFC those limitations which he found to be consistent with her medical records. The ALJ gave Dr. Choudhary's opinions, particularly his opinion that Harris would need to lie down to alleviate her symptoms, "moderate weight," finding they were not supported by his treatment notes, her pattern of treatment, her substantial activities of daily living, or notes of her treatment with her cardiologists and other neurologists. (Tr. 25) That the ALJ did not specifically discuss Harris' headaches does not mean the ALJ did not consider them, see Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (internal citations omitted), particularly since the conditions, including headaches, detailed in Dr. Choudhary's opinions were addressed in extensive detail throughout the ALJ's decision and conflicted with other evidence in the record. See also Wheeler v. Apfel, 224 F.3d 891, 896 (8th Cir. 2000).

**VI.    Conclusion**

For the foregoing reasons, the Court finds the ALJ's decision is supported by substantial evidence contained in the record as a whole, and, therefore, the Commissioner's decision should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and Plaintiff's Complaint is **DISMISSED** with prejudice. A separate judgment will accompany this Order.


Dated this 30th day of September, 2015.

_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**